IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

THILO WEISS,

                      Plaintiff,

            vs.

SHREE BAIDYANATH AYURVED BHAWAN
PVT. LTD.; ABHINAV GAUR; SURESHKUMAR
RAMNARAYAN SHARMA; AJAY SHARMA;
RAM KRISHAN SHARMA; PRAMOD SHARMA;
SHIVNATH RAMNARAYAN SHARMA; ANURAG
SHARMA; ANAND SHARMA; ARVIND SHARMA
and NAVEEN SHARMA,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

Case No. 1:21-cv-00155

**COMPLAINT**

JURY TRIAL DEMANDED

      Plaintiff THILO WEISS ("Thilo" or "Plaintiff"), by his attorneys, Berg & Androphy, as

and for his complaint against Defendants SHREE BAIDYANATH AYURVED BHAWAN

PVT. LTD.; ABHINAV GAUR; SURESHKUMAR RAMNARAYAN SHARMA; AJAY

SHARMA; RAM KRISHAN SHARMA; PRAMOD SHARMA; SHIVNATH RAMNARAYAN

SHARMA; ANURAG SHARMA; ANAND SHARMA; ARVIND SHARMA and NAVEEN

SHARMA (collectively, "Defendants" or "Baidyanath"), states and alleges as follows:

### PRELIMINARY STATEMENT

      1.     This is an action for products liability, failure to warn, battery and intentional

infliction of emotional distress, arising out of Defendants' sale of "Ayurvedic" herbal

supplements that were laced with extraordinarily high levels of lead and other toxic substances.

Plaintiff Thilo ingested Defendants' supplements and then went through several agonizing weeks

of pain and nausea that resulted in several trips to, and stays in, the hospital and fears that he

would die.  Ultimately, blood tests on Thilo – and laboratory tests of Defendants' supplements – showed terrifying levels of lead, a toxic heavy metal that almost killed Thilo.  The supplements also contained two other highly poisonous elements, arsenic and mercury.  Indeed, one of the supplements that Thilo took contained 30 percent lead and mercury.

2.      "Ayurveda" is a holistic medical approach that originated on the Indian subcontinent.  Defendants market their Ayurvedic supplements, which are supposed to contain "natural" products (mostly plant-based), as treatments for a number of ailments, including heart disease, arthritis, diabetes and infertility, and as promoters of good health in general.  According to Defendants, their supplements have "no side effects" and provide a "gentle healing touch."  Ayurvedic supplements are very popular among both the Indian and general populations in the United States, India and elsewhere.

3.      What Ayurvedic supplements should not do, of course, is poison the user, and it is not surprising that Defendants' websites and packaging make no mention of any excessive levels of toxins, especially ones as dangerous as lead, mercury or arsenic.  Nonetheless, Defendants are clearly aware of the fact that their products contain poisonous toxins:  in 2015, the Food & Drug Administration ("FDA") tested ten of Defendants' products and issued a public warning that they contained unsafe levels of lead and mercury.  Similar warnings were also issued in Canada.

4.      Thilo, believing Defendants' claims that their products cause "no side effects," chose three Baidyanath products – *Pushpadhanwa Ras*, *Shukramatrika Bati* and *Manmath Ras* (collectively, the "Toxic Supplements") – to encourage fertility as he and his wife sought to start a family.   What Thilo did not know, and could not have known, is that all three Toxic Supplements contained high levels of lead, mercury and arsenic.  Indeed, the Toxic Supplements contained levels of lead that were thousands of times greater than what United States and Indian

2

authorities deem safe.  Thilo, after consuming these three Toxic Supplements, almost died.  At one point, his blood contained lead levels that were *ten times* the level the United States Centers for Disease Control ("CDC") deems to be "high."  Although doctors were ultimately able to save Thilo's life, he suffered months of pain and debilitation, and the long-term effects of this poisoning are not clear.

5.     Defendants' conduct in selling poison to unsuspecting consumers is outrageous, if not criminal.  As the direct and proximate result of Defendants' conduct, Thilo unwittingly purchased and consumed poison, causing Thilo to become grievously sick and endure weeks of agonizing pain, suffering, mental anguish, the loss of capacity for the enjoyment of life, inconvenience, disability and the loss of future earning capacity and to incur significant medical expenses.

6.     As demonstrated in more detail below, Thilo is entitled to damages as against Defendants for their egregious conduct, including an award of exemplary damages.

## PARTIES

7.     Plaintiff Thilo is an individual domiciled in New Jersey residing at 125 43rd Street, Apartment 702, Union City, New Jersey 07087.  At all times relevant to this action, Thilo was domiciled in the State of New York in Astoria, Queens.

8.     Defendant Shree Baidyanath Ayurved Bhawan Pvt. Ltd. ("Baidyanath") is a private company organized under and operating pursuant to the laws of India with its principal place of business at 1 Gupta Lane, Kolkata WB 700006, India.

9.     Defendant Abhinav Gaur ("Abhinav") is an individual domiciled in India and is an owner/member of Baidyanath.

3

10.    Defendant Sureshkumar Ramnarayan Sharma ("Sureshkumar") is an individual domiciled in India and is an owner/member of Baidyanath.

11.    Defendant Ajay Sharma ("Ajay") is an individual domiciled in India and is an owner/member of Baidyanath.

12.    Defendant Ram Krishan Sharma ("Ram") is an individual domiciled in India and is an owner/member of Baidyanath.

13.    Defendant Pramod Sharma ("Pramod") is an individual domiciled in India and is an owner/member of Baidyanath.

14.    Defendant Shivnath Ramnarayan Sharma ("Shivnath") is an individual domiciled in India and is an owner/member of Baidyanath.

15.    Defendant Anurag Sharma ("Anurag") is an individual domiciled in India and is an owner/member of Baidyanath.

16.    Defendant Anand Sharma ("Anand") is an individual domiciled in India and is an owner/member of Baidyanath.

17.    Defendant Arvind Sharma ("Arvind") is an individual domiciled in India and is an owner/member of Baidyanath.

18.    Defendant Naveen Sharma ("Naveen" and, with Abhinav, Sureshkumar, Ajay, Ram, Pramod, Shivnath, Anurag, Anand and Arvind, the "Individual Defendants") is an individual domiciled in India and is an owner/member of Baidyanath.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a)(2).  There is complete diversity of citizenship as between Plaintiff, a resident of New Jersey, and Defendants, as Baidyanath's principal place of business is in India and the

Individual Defendants all reside in India.  Further, the damages at issue in this action exceed $75,000.

20.     Jurisdiction over Defendants is appropriate under New York Civil Practice Law and Rules ("CPLR") § 302(a)(1) because Defendants transact business within the State of New York, in that they offer their products for sale to New York consumers via brick and mortar retailers located throughout New York and via the internet through various websites, including Baidyanath's United States commercial website, registered as www.baidyanath.com (the "Baidyanath US Website").[1]  "Websites that are of a commercial nature and permit consumers to place orders and e-mail questions can confer personal jurisdiction pursuant to section 302(a)(1)." *Chanel, Inc. v. Doubinine*, 2008 WL 4449631, at *2 (E.D.N.Y. Oct. 2, 2008).  *See also EnviroCare Techs., LLC v. Simanovsky*, 2012 WL 2001443, at *4 (E.D.N.Y. June 4, 2012).

21.     Defendants operate not just one, but several, interactive commercial websites on which New York residents can place orders and email questions.  Defendants must accept the legal responsibilities that accompany their purposeful availment of the benefits of an internet-created world market, such as profits from New York customers.

22.     Jurisdiction over Defendants is also appropriate under CPLR § 302(a)(3)(i) because Defendants committed a tortious act outside the State of New York that caused significant injury to Plaintiff within New York, and Defendants routinely distribute their products for sale to retailers within New York and derive substantial revenue from those sales as well as from online sales to New York consumers.[2]

---

[1] The fact that the Baidyanath US Website's URL ends in ".com" indicates that is based in the United States, because "Verisign, Inc. is the registry operator for all '.com' domain names and it is located in Reston, Virginia." *Chen Lunxi v. Doe*, 2020 WL 2026333, at *3 (E.D. Va. Mar. 27, 2020).

[2] There is no single test or specific dollar or percentage threshold for what constitutes "substantial revenue" under CPLR § 302(a)(3)(i).  However, "substantial" revenue, for purposes of establishing long-arm jurisdiction, does not

23.     Jurisdiction over Defendants is also appropriate under CPLR § 302(a)(3)(ii) because Defendants committed tortious acts outside New York that caused significant injury to Plaintiff within New York, Defendants derive substantial revenue from international commerce, and Defendants' offer of their products for sale to New York consumers on more than one interactive website (as well as in stores throughout the state) gave Defendants reason to expect their tortious acts to have consequences in New York. *See, e.g.*, *Merck Eprova AG v. Gnosis S.p.A.*, 2008 WL 5336587, at *5 (S.D.N.Y. Dec. 12, 2008) ("Having embarked on a course of commercial activity that sought to capitalize on the entire United States market, it was foreseeable that Defendants might be sued in any state, including New York").

24.     Defendants have proclaimed their intention to enter the "lucrative" market for Ayurvedic products in the United States (*see* ¶¶ 26-27, *infra*), and have tangibly exhibited this intention by incorporating a company in Michigan, applying for, and obtaining, a United States patent, and creating at least four different United States commercial websites.[3] Further, Defendants should reasonably have expected consequences to result from their selling poisonous pills to consumers in New York.[4] Finally, on the Baidyanath US Website, Baidyanath declares that its mission is "[t]o be the global numero uno in AYURVEDA and its related spheres," and its "export division is rapidly widening its network worldwide." Defendants' operations are not

---

equate to "most" or any set percentage of a defendant's revenue, and courts have found as revenues less than one percent of a defendant's total revenues to be "substantial."

[3] *See City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 417 (E.D.N.Y. 2007) (noting that a "nondomiciliary Internet service provider's statement on electronic home page that it could help customers 'across the U.S.' supported section 302(a)(3)(ii) long-arm jurisdiction") (citations omitted).

[4] "[T]he consequences foreseen need not be those that are the precise subject of the lawsuit." *Id.* at 416 (citation omitted).

of a local character, and the exercise of jurisdiction by a state to which Defendants have been deliberately expanding their business is entirely appropriate.[5]

25.    Venue is proper in this district by operation of 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action took place in this district.

## FACTUAL ALLEGATIONS

### I.    Defendants' Dangerous Global Enterprise

#### A.    Background

26.    Marketing itself as "[o]ne of India's most respected [c]ompanies," family-owned Baidyanath claims to be the "acknowledged leader of Ayurvedic know-how" that has "played a pioneering role in re-establishing ancient knowledge with modern research and manufacturing techniques."  Defendant Ram proclaims on Baidyanath's website that using its "vast experience and expertise," Baidyanath "delved deep into the resources of Ayurveda, blended it seamlessly with modern research and manufacturing technology" and created a "whole range of Ayurvedic lifestyle solution products that help you lead a better life, naturally."

27.    Although headquartered in India, Baidyanath's products are produced and sold around the world.  Indeed, Baidyanath boasts it has more than10,000 distributors and that it is "all set to conquer the global market . . . making its presence felt in" the United Kingdom, Italy, Germany, France, Netherlands, Latvia, Singapore, Mauritius, Kenya, Seychelles, Greece, Morocco, New Zealand, Bangladesh, Australia and the United States.

28.    In 2017, the website Pharmabiz published an article reporting that the value of the global market for Ayurvedic products was as high as $10 billion dollars and that the "USA

---

[5] The purpose of the jurisdictional requirement that substantial revenue be derived from interstate commerce is "to preclude the exercise of jurisdiction over non-domiciliaries who might cause direct, foreseeable injury within the State but whose business operations are of a local character."  *Holbrook Plastic Pipe Supply, Inc. v. Jackson*, 2006 WL 8441408, at *6 (E.D.N.Y. Jan. 3, 2006) (citations and quotations omitted).

constitutes a big chunk of the global [Ayurvedic] market." In that article, a Baidyanath representative told Pharmabiz that Baidyanath had "been exporting to the US for several years," and that "[t]he popularity of herbal healthcare products has grown manifold in the [United States] over the years[,] offering [a] lucrative opportunity for [a] company like us to penetrate the market." Baidyanath also stated that it expected to increase its exports to the United States from $50 million to $80 million by 2020.

29.     Baidyanath's Ayurvedic products sold under the Baidyanath brand name are offered for sale at physical retail locations in the State of New York and are also available for purchase and delivery into New York on the Baidyanath US Website and through other online retailers such as Amazon and eBay.

30.     Baidyanath has also expanded its reach into the United States by selling other Ayurvedic products under different brand names, including Kapiva, Goodcare and Ayurvedant, on United States commercial websites: www.allayurveda.com, www.ayurvedant.com and www.goodcarepharma.com. Many of these other Ayurvedic products are also available for purchase on Amazon and eBay. Indeed, Baidyanath's operations in the United States are so extensive that the company recently received a United States patent for an Ayurvedic heart medication known as "Cardiwin," which is currently sold on www.ayurvedant.com and was recently being sold on Amazon.

31.     Furthermore, upon information and belief, Defendants established Mantra Herbal Solutions, Inc., a United States corporation with its headquarters in Michigan, in 2004 in order to assist with the importation and distribution of Defendants' Ayurvedic products throughout the United States. Mantra Herbal Solutions recently offered products for sale on a United States commercial website, www.mantraherbal.com, which listed an address in South Canton, MI.

32.     After what happened to Thilo, it is truly frightening that all of Defendants'
products can be easily purchased and consumed by anyone (including children) on Baidyanath's
United States commercial websites.

**B.      Defendants' Prior Knowledge Of Their Products' Dangers**

33.     Despite their popularity, Defendants' products are, at least at times,
extraordinarily dangerous, and their scheme to "penetrate" United States markets with these
products poses a very real threat to United States consumers.  In fact, United States authorities
have already found Defendants' products to be dangerously laced with excessive levels of heavy
metals, including lead, which are not safe for human exposure even in extremely small amounts.
The World Health Organization states that "[t]here is no known 'safe' blood lead concentration."

34.     In September 2015, the FDA announced that its testing, in conjunction with
testing by the New York City Department of Health ("NYDOH"), demonstrated that ten separate
Ayurvedic supplements manufactured by Defendants had unacceptably high levels of mercury
and lead.  The FDA thus urged consumers to stop using those supplements and to consult with
their physicians, even in the absence of symptoms.  Likewise, in March 2016, the Canadian
government issued a "foreign product alert" about Defendants' supplements due to high levels of
mercury and lead.

35.     However, despite being made aware of these problems by multiple governmental
authorities in at least two countries, Defendants did nothing to address the lethality of their
supplements or to stop selling them.  Nine of the ten supplements the FDA found to contain high
levels of lead and mercury are still being sold on www.baidyanath.com.  As described in greater
detail below, Defendants' failure to act nearly killed Thilo.

36.     The Individual Defendants are each personally liable for the injuries alleged

herein. Despite being aware of dangerous levels of heavy metals in Baidyanath's supplements, the Individual Defendants did nothing to correct the problem, but instead continued to distribute these dangerous products, wrongfully and fraudulently misrepresenting to consumers that the products were safe.

II.     **Plaintiff Thilo Is Poisoned By, And Almost
         Dies Because Of, Defendants' Dangerous Products**

         A.      **Thilo's Baffling Disorders**

37.     In January 2019, Thilo traveled to India to visit his wife's family. While there, Thilo and his wife had a fertility consultation with an Ayurvedic practitioner, as the couple had been trying to start a family for quite some time.

38.     Among other things, the practitioner recommended that Thilo take the following Ayuervedic supplements: *Pushpadhanwa Ras*, *Shukramatrika Bati* and *Manmath Ras*. Accordingly, before departing India, Plaintiff purchased the Toxic Supplements, each manufactured by Defendants. Nothing on the Toxic Supplements' packaging warned Thilo that the Toxic Supplements contained lethal levels of mercury, lead or arsenic.

39.     Indeed, since Thilo knew that Baidyanath products were available for sale in the United States, Thilo believed that these products were safe. Thilo also reviewed each product on the Baidyanath US Website, which not only failed to disclose the lethality of the Toxic Supplements, but also falsely claimed that Defendants' products were safe, had "no side effects" and, even more ironically, provided a "gentle healing touch."

40.     Thilo departed India and returned to the United States on January 20, 2019. In accordance with the dosage recommendations on the Baidyanath US Website, which were two pills of each Toxic Supplement twice a day, Thilo began taking the Toxic Supplements on January 21, 2019.

41.     Consistent with Defendants' representations as to their products, Thilo observed no immediate effects from ingesting the Toxic Supplements.  However, by the second week of February 2019, he began to notice intermittent tenderness in his abdomen.  The area was at times so sensitive that even a caress from his wife was too uncomfortable to withstand.  Thilo had no idea what was causing this tenderness and never suspected that Defendants' Toxic Supplements could be the cause.

42.     A few weeks later, Thilo's pain began to intensify and was now accompanied by abdominal bloating.  Thilo also became increasingly fatigued and lethargic.  At the time, Thilo was the Associate Director in charge of Risk Control at Norddeutsche Landesbank Girozentrale (a German bank) and was also studying to complete his German Masters of Science degree.  Thilo could not concentrate on his work or studies for longer than two to three hours at a time.  Further, he had difficulty following discussions during business meetings and had issues focusing during his exams.

43.     As time progressed, Thilo became even more fatigued.  He could not function without taking several naps during the day for up to two hours at time, and although he slept more and more each night, he never felt rested.  He also developed shortness of breath, and though he had previously ridden his bike six miles to and from work every day, he sometimes found himself unable to walk even a single block.

44.     By the end of March 2019, Thilo's head often felt heavy and fuzzy.  During these episodes, Thilo could not complete routine tasks, had difficulty finding items that were right in front of him, and made mistakes in simple mathematical equations that are a routine part of his job.  Thilo also started experiencing memory lapses.  Not sure what was causing his problems, Thilo decided to stop taking the Toxic Supplements as a precaution.

45.     Thilo's health continued to worsen.  On April 8, 2019, Thilo was forced to leave work early because he was experiencing severe abdominal pains, nausea, dizziness and mental confusion.  The next day, Thilo's wife took him to the New York-Presbyterian Weil Cornell Medical Center ("Presbyterian") emergency room.  While waiting in the emergency room, Thilo could not sit, stand or lie in any position without agonizing pain.  Thilo thought, correctly, that he was dying.

46.     Thilo was admitted to Presbyterian and, as regular painkillers did nothing to numb Thilo's pain, he was given reoccurring injections of morphine.  However, morphine also did little to dull Thilo's pain, and he was in agony throughout the night, screaming from the pain for hours.  The doctors were perplexed by Thilo's symptoms and subjected Thilo to a battery of tests, including, but not limited to, blood tests, x-rays, ultrasounds, CT scans and nuclear medicine scans.  Initial blood tests revealed that Thilo's red blood cell count was severely depleted, and a CT scan performed on April 11 noted "prominent gastric distension of large and small bowel loops throughout the abdomen."

47.     Thilo's digestive system had come to a halt.  Accordingly, Thilo was given a combination of painkillers and laxatives, which seemed to at least restore some function to his digestive system, and his symptoms improved somewhat.  Pending the results of a number of tests – including a heavy metal test – Thilo was discharged from Presbyterian on April 13.

48.     However, Thilo's severe abdominal pain returned in the early evening of April 16. The pain intensified overnight and, on the morning of April 17, the pain was so intense that Thilo's wife once again rushed him to the Presbyterian emergency room where Thilo was again given pain killers and laxatives.  The combination of pain killers and laxatives alleviated some of Thilo's pain, and he was discharged that same day.

### B.    Defendants' Role In Thilo's Disorders Is Uncovered

49.    Later that evening, one of the attending doctors from Presbyterian called Thilo and urged him to immediately return to Presbyterian:  Thilo's blood tests showed that Thilo had been poisoned with a lethal dose of lead.  In fact, the tests revealed that Thilo's blood contained 78 micrograms per deciliter (mcg/dL) of lead – almost eight times the lead concentration considered "high" for adults according to the CDC.  The Presbyterian doctors informed Thilo that if he did not return to the hospital immediately, he would die.

50.    Indeed, Thilo's poisoning was so severe that his doctors had never seen a patient present with Thilo's symptoms, which left the doctors temporarily baffled and necessitated consultations with specialists.  And although the Presbyterian doctors ultimately diagnosed Thilo and saved his life, his ordeal was (and is) far from over.

51.    Thilo rushed back to Presbyterian and was admitted and placed on morphine and then Dilaudid to dull his excruciating pain, both of which caused Thilo to hallucinate.  In the end, however, neither of these powerful painkillers offered Thilo any respite.

52.    A second blood test on April 17 revealed that Thilo's lead levels had increased to 90 mcg/dL – nearly *ten times* what the CDC considers to be "high."  These results were shocking and unlike anything Thilo's doctors had previously seen.

53.    To alleviate Thilo's severe bloating, doctors inserted a nasal tube to pump excessive gas and liquids from his stomach.  This tube remained uncomfortably in place for three days.

54.    Doctors also administered succimer, a chelating agent that binds with heavy metals to help the body purge itself of such metals.

55.      The succimer initially proved ineffective, so doctors switched Thilo to Dimercaprol, which is used to treat acute mercury, lead and/or arsenic poisoning.  Dimercaprol is administered via painful intramuscular injection, using thick needles of notable diameter.  Thilo underwent nearly four days of these injections, administered every four hours.  During this period, the Presbyterian doctors advised Thilo's wife that there was a high probability that Thilo would die.

56.      In addition to the pain associated with the administration of Dimercaprol, Thilo suffered through a number of the medication's side effects, including nausea, vomiting, elevated blood pressure and tachycardia.

57.      After approximately 20 Dimercaprol injections, doctors switched Thilo back to succimer and he was eventually released on April 25, with a prescription for 300 doses of succimer – at a cost of approximately $150 per dose.  Thilo lost a significant amount of weight during his hospitalization, and Thilo was told to take vitamin supplements as the succimer removed from his body other, necessary nutrients.

58.      Thilo slowly improved throughout the month of May and into June 2019, but in early June, he received another shock.  A June 10, 2019 blood test revealed unexpectedly elevated levels of lead.  Doctors concluded that the sudden elevation of lead in Thilo's blood was due to the slow purge of lead from Thilo's bones into his bloodstream.  At present, doctors are unsure whether Thilo's body will ever fully purge itself of the poisons from the Toxic Supplements.  Thilo is still experiencing symptoms of Defendants' poisoning, including headaches and fatigue and, as a result, is continuing to monitor the levels of lead and other toxins in his body.  Indeed, it is possible Thilo will require continual monitoring and testing for the rest of his life.

C.    **Thilo Almost Died Because Of His Consumption Of Defendants' Products**

59.    Presbyterian provided samples of the Toxic Supplements to the NYDOH, which then subjected those samples to routine testing.  The results were horrifying:  Defendants' *Pushpadhanwa Ras* was found to contain 130,000 parts per million ("ppm") of lead, 170,000 ppm of mercury and 4.3 ppm of arsenic.  Put another way, Defendants' *Pushpadhanwa Ras* was inexplicably comprised of 13 percent lead and 17 percent mercury – *i.e.*, *almost one third of that supplement was poison*.

60.    The NYDOH testing also showed Defendants' *Shukramatrika Bati* contained 16 ppm of lead, 43,000 ppm of mercury and 6 ppm of arsenic; and Defendants' *Manmath Ras* contained 480 ppm of lead, 42,000 ppm of mercury and 14 ppm of arsenic.  A true and accurate copy of these test results is attached hereto as Exhibit A.

61.    By way of comparison, according to the National Academies of Sciences, Engineering and Medicine, the permissible limit of lead in any supplement intended for human consumption is 2 ppm, and the limits for mercury and arsenic are 1 and 3 ppm, respectively. Further, India's Ministry of Ayurveda, Yoga & Naturopathy, Unani, Siddha and Homeopathy, which, among other things, regulates Defendants' production of Ayurvedic supplements, sets the permissible levels of lead, mercury and arsenic at 10 ppm, 1 ppm and 3 ppm, respectively.

62.    To say that the Toxic Supplements "exceeded" both United States and Indian limits is a vast understatement.  Clearly, Defendants did not produce such dangerous products by mere accident – the astronomical levels of lead, mercury and arsenic in the Toxic Supplements can only be the result of wanton and reckless behavior.  The extent of Defendants' wanton and reckless conduct became clear when – even after the FDA's 2015 announcement of the incredibly high levels of mercury and lead in Defendants' supplements – Defendants did nothing

to remove the poison from any of their products, including the Toxic Supplements, continuing to manufacture and sell their poison to unsuspecting customers like Thilo.

63.    Although Thilo is recovering, his ultimate prognosis is unclear.  Thilo's body still has not been entirely purged of the lingering poisons contained in the Toxic Supplements, and there is no guarantee that this will ever happen.  In fact, a blood test performed in October 2019 still showed the presence of lead in Thilo's body at nearly three and a half times the level identified as "high" by the CDC, even though Thilo stopped taking the Toxic Supplements six months earlier, in or around March 2019.

64.    While he is feeling better, the fact remains that (thanks to Defendants' remarkable indifference to human life), Defendants' Toxic Supplements exposed Thilo to massive doses of toxic heavy metals.  It is unknown what the ultimate physical impact will be on his body and mind as Thilo ages.  He is only 36 years old.

65.    While in the throes of poisoning caused by Defendants' Toxic Supplements, Thilo experienced intense, agonizing pain, coupled with a genuine and completely substantiated fear that he was dying.  Further, the entire medical process that Thilo endured in order to purge his body of Defendants' poisons was not only terrifying for Thilo, but also caused him to incur significant medical expenses.

66.     In short, Defendants' poisoning of Thilo caused him great pain and suffering, mental anguish, the loss of capacity for the enjoyment of life, inconvenience, disability, the loss of future earning capacity and to incur significant medical expenses.  These injuries are permanent and continuing in nature.

## COUNT I

**(Damages: Strict Products Liability)**

67.    Plaintiff realleges Paragraphs 1 through 66 of this Complaint and incorporates each by reference as if fully restated herein.

68.    Defendants manufacture Ayurvedic supplements, including the Toxic Supplements, and distribute them around the world for human consumption.

69.    In January 2019, Thilo purchased three Toxic Supplements manufactured by Defendants: *Pushpadhanwa Ras*, *Shukramatrika Bati* and *Manmath Ras*.  Thilo began taking those Toxic Supplements on January 21, 2019, upon his return to New York from a trip abroad.

70.    Unbeknownst to Thilo, the Toxic Supplements he purchased were tainted with lethal doses of the heavy metals lead, mercury and arsenic.  The concentrations of heavy metals in Defendants' Toxic Supplements were over a hundred thousand times higher than acceptable safety standards.

71.    The Toxic Supplements were contaminated and therefore defective when they left Defendants' hands.  The Toxic Supplements were thus in a condition not reasonably contemplated by Thilo, and the lethal levels of heavy metal contaminants rendered those Toxic Supplements unreasonably dangerous.

72.    As the direct and proximate result of consuming Defendants' Toxic Supplements, Thilo became grievously sick, enduring weeks of agonizing pain, suffering, mental anguish, the loss of capacity for the enjoyment of life, inconvenience, disability, the loss of future earning capacity and medical expenses.  These losses are continuing in nature.

73.     By reason of the foregoing, Thilo is entitled to a judgment against Defendants for compensatory damages in an amount to be determined at trial but in excess of $75,000, together with an award of punitive damages.

## COUNT II

### (Damages: Negligent Products Liability)

74.      Plaintiff realleges Paragraphs 1 through 66 of this Complaint and incorporates each by reference as if fully restated herein.

75.     Defendants manufacture Ayurvedic supplements, including the Toxic Supplements, and distribute them around the world for human consumption.  As such, Defendants have a duty to manufacture their products with due care and to provide supplements that are safe for their intended use.

76.     In January 2019, Thilo purchased three Ayurvedic supplements manufactured by Defendants: *Pushpadhanwa Ras*, *Shukramatrika Bati* and *Manmath Ras*.  Thilo began taking those Toxic Supplements on January 21, 2019, upon his return to New York from a trip abroad.

77.     Unbeknownst to Thilo, the Toxic Supplements he purchased were tainted with lethal doses of the heavy metals lead, mercury and arsenic.  The concentrations of heavy metals in Defendants' Toxic Supplements were over a hundred thousand times higher than concentrations deemed safe for human consumption by United States and Indian authorities. Offering such dangerously contaminated products for sale was in breach of Defendants' duty to their customers in general and to Thilo in particular.

78.     As the direct and proximate result of Defendants' breach, Thilo became grievously sick, enduring weeks of agonizing pain, suffering, mental anguish, the loss of

capacity for the enjoyment of life, inconvenience, disability, the loss of future earning capacity and medical expenses.  These losses are continuing in nature.

79.    By reason of the foregoing, Thilo is entitled to a judgment against Defendants for compensatory damages in an amount to be determined at trial but in excess of $75,000, together with an award for punitive damages.

## COUNT III

### (Damages: Strict Liability Failure to Warn)

80.     Plaintiff realleges Paragraphs 1 through 66 of this Complaint and incorporates each by reference as if fully restated herein.

81.    Defendants manufacture Ayurvedic supplements, including the Toxic Supplements, and distribute them around the world for human consumption.

82.    Defendants have a duty to warn consumers such as Plaintiff that their Toxic Supplements contain unsafe levels of the heavy metals lead, mercury and arsenic, and that consumption of the supplements poses a grave risk to a consumer's health.

83.    As the manufacturer of those Toxic Supplements, Defendants should have known about the presence of unsafe levels of heavy metals in those products.  In fact, Defendants have affirmatively known since at least 2015 that their products contain unsafe levels of heavy metals, as both the United States and Canadian governments publicly warned their citizens about Defendants' products.

84.    Defendants breached their duty to warn consumers, including Thilo.  Nothing on the packaging or labeling of the Toxic Supplements warned Thilo that the products contain excessive levels of dangerous heavy metals, which exceed safety limits set by both United States and Indian authorities by several orders of magnitude.  Nor did Defendants warn Thilo, in any

manner, that consumption of those Toxic Supplements could lead to life-threatening heavy metal poisoning.

85.     As the direct and proximate result of Defendants' failure to warn, Thilo purchased and consumed Defendants' Toxic Supplements, causing Thilo to become grievously sick and endure weeks of agonizing pain, suffering, mental anguish, the loss of capacity for the enjoyment of life, inconvenience, disability, and the loss of future earning capacity and incurred significant medical expenses.  These injuries are continuing in nature.

86.     By reason of the foregoing, Thilo is entitled to a judgment against Defendants for compensatory damages in an amount to be determined at trial but in excess of $75,000, together with an award of punitive damages.

## COUNT IV

### (Damages: Negligent Failure to Warn)

87.     Plaintiff realleges Paragraphs 1 through 66 of this Complaint and incorporates each by reference as if fully restated herein.

88.     Defendants manufacture Ayurvedic supplements, including the Toxic Supplements, and distribute them around the world for human consumption.

89.     Defendants had a duty to warn consumers such as Plaintiff that their Toxic Supplements contain unsafe levels of the heavy metals lead, mercury and arsenic, and that consumption of the Toxic Supplements poses a grave risk to consumers' health.

90.     As the manufacturer of the Toxic Supplements, Defendants should have known about the presence of unsafe levels of heavy metals in those products.  In fact, Defendants have affirmatively known since at least 2015 that their products contain unsafe levels of heavy metals,

as both the United States and Canadian governments publicly warned their citizens about Defendants' products.

91.     Defendants negligently breached their duty to warn consumers, including Thilo, of the deadly components in their supplements.  Nothing on the packaging or labeling of the Toxic Supplements warned Thilo or other purchasers that the Toxic Supplements contain excessive levels of dangerous heavy metals, which exceed safety limits set by United States and Indian authorities by several orders of magnitude.  Nor did Defendants warn Thilo, in any manner, that consumption of those Toxic Supplements would lead to life-threatening heavy metal poisoning.

92.     As the direct and proximate result of Defendants' failure to warn, Thilo purchased and consumed Defendants' Toxic Supplements, causing Thilo to become grievously sick and endure weeks of agonizing pain, suffering, mental anguish, the loss of capacity for the enjoyment of life, inconvenience, disability, the loss of future earning capacity and to incur significant medical expenses.  These injuries are continuing in nature.

93.     By reason of the foregoing, Thilo is entitled to a judgment against Defendants for compensatory damages in an amount to be determined at trial but in excess of $75,000, together with an award of punitive damages.

## COUNT V

### (Damages: Battery)

94.     Plaintiff realleges Paragraphs 1 through 66 of this Complaint and incorporates each by reference as if fully restated herein.

95.     Defendants manufacture Ayurvedic supplements, including the Toxic Supplements, and distribute them around the world for human consumption.

96.    In January 2019, Thilo purchased three Toxic Supplements manufactured by Defendants: *Pushpadhanwa Ras*, *Shukramatrika Bati* and *Manmath Ras*. Thilo began taking those Toxic Supplements on January 21, 2019, upon his return to New York from a trip abroad.

97.    Unbeknownst to Thilo, the Toxic Supplements he purchased were tainted with lethal doses of the heavy metals lead, mercury and arsenic. The concentrations of heavy metals in Defendants' Toxic Supplements were over a hundred thousand times higher than concentrations deemed safe for human consumption by United States and Indian authorities.

98.    Defendants manufactured the Toxic Supplements with the intent and knowledge that purchasers, like Thilo, would ingest those products. Thilo's ingestion of the Toxic Supplements constituted Defendants' physical contact with him.

99.    Thilo did not consent to ingesting the poisons in Defendants' Toxic Supplements, and those poisons caused Thilo great physical pain and injury. Defendants' conduct in causing consumers, like Thilo, to ingest poisons is outrageous and highly offensive in nature.

100.    As the direct and proximate result of Defendants' unwanted contact, Thilo has suffered pain, suffering, mental anguish, the loss of capacity for the enjoyment of life, inconvenience, disability and the loss of future earning capacity and has incurred significant medical expenses. These injuries are continuing in nature.

101.    By reason of the foregoing, Thilo is entitled to a judgment against Defendants for compensatory damages in an amount to be determined at trial but in excess of $75,000, together with an award of punitive damages.

## COUNT VI

**(Damages: Intentional Infliction of Emotional Distress)**

102.    Plaintiff realleges Paragraphs 1 through 66 of this Complaint and incorporates each by reference as if fully restated herein.

103.    Defendants manufacture Ayurvedic supplements, including the Toxic Supplements, and distribute them around the world for human consumption.

104.    In January 2019, Thilo purchased three Toxic Supplements manufactured by Defendants: *Pushpadhanwa Ras*, *Shukramatrika Bati* and *Manmath Ras*.  Thilo began taking those Toxic Supplements on January 21, 2019, upon his return to New York from a trip abroad.

105.    Unbeknownst to Thilo, the Toxic Supplements he purchased were tainted with lethal doses of the heavy metals lead, mercury and arsenic.  The concentrations of heavy metals in Defendants' Toxic Supplements were over a hundred thousand times higher than concentrations deemed safe for human consumption by United States and Indian authorities.

106.    As the manufacturer of those Toxic Supplements, Defendants should have known about the presence of unsafe levels of heavy metals in those products.  In fact, Defendants have affirmatively known since at least 2015 that the Toxic Supplements contain unsafe levels of heavy metals, as both the United States and Canadian governments publicly warned their citizens about Defendants' products.

107.    The manufacture and sale of the Toxic Supplements, with concentrations of heavy metals thousands of times higher than acceptable safety standards, constitutes extreme and outrageous conduct.

108.    Defendants intended that purchasers, such as Thilo, would ingest these Toxic Supplements, yet Defendants utterly and callously disregarded the substantial probability that

consumers of the Toxic Supplements would be terribly injured and suffer severe emotional distress from consuming the Toxic Supplements.

109.    Thilo purchased and consumed Defendants' Toxic Supplements, causing Thilo to become grievously sick and endure weeks of agonizing pain, suffering, mental anguish, and severe emotional distress.

110.    By reason of the foregoing, Thilo is entitled to a judgment against Defendants for compensatory damages in an amount to be determined at trial but in excess of $75,000, together with an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants and grant the following relief:

(a)  On Count One of the Complaint, an award for damages to be determined at trial, but not less than $75,000, together with an award of punitive damages;

(b) On Count Two of the Complaint, an award for damages to be determined at trial, but not less than $75,000, together with an award of punitive damages;

(c) On Count Three of the Complaint, an award for damages to be determined at trial, but not less than $75,000; together with an award of punitive damages;

(d) On Count Four of the Complaint, an award for damages to be determined at trial, but not less than $75,000; together with an award of punitive damages;

(e) On Count Five of the Complaint, an award for damages to be determined at trial, but not less than $75,000; together with an award of punitive damages;

(f) On Count Six of the Complaint, an award for damages to be determined at trial, but not less than $75,000; together with an award of punitive damages;

(g) An award to Plaintiff of their costs, including reasonable attorneys' fees, in

prosecuting this action; and

(h) Any other relief to which Plaintiff may be entitled as a matter of law or equity that the

Court determines to be just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a jury trial on

all issues so triable.

DATED:    New York, New York
          January 12, 2021

                            Respectfully submitted,

                            BERG & ANDROPHY

                            By:

                                Jenny H. Kim (jkim@bafirm.com)
                                Emily Burgess (eburgess@bafirm.com)
                                120 West 45th Street, 38th Floor
                                New York, New York 10036
                                Tel:  (646) 766-0073
                                Fax:  (646) 219-1977

                                *Attorneys for Plaintiff*