UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------
THILO WEISS,

                    Plaintiff,

  -against-

SHREE BAIDYANATH AYURVED
BHAWAN PVT. LTD.,

                    Defendant.
--------------------------------------------------------------

**REPORT & RECOMMENDATION**

21-cv-155 (ERK) (JRC)

JAMES R. CHO, United States Magistrate Judge:

Plaintiff Thilo Weiss ("Weiss" or "plaintiff") commenced this action against Shree Baidyanath Ayurved Bhawan Pvt. Ltd. ("Baidyanath" or "defendant") seeking to recover damages on theories of products liability, failure to warn, battery, and intentional infliction of emotional distress for harm plaintiff allegedly suffered after consuming defendant's "Ayurvedic" supplements.[1] *See* Compl. ¶ 1, ECF No. 1; Am. Compl. ¶ 1.[2] Specifically, plaintiff alleges that after ingesting the Ayurvedic supplements he purchased from Baidyanath, he was hospitalized and treated for, among other things, severe lead poisoning. Am. Compl. ¶¶ 1, 4, 45, 48, 49.

On April 10, 2024, the Honorable Edward R. Korman granted plaintiff's motion for default judgment as to Counts I through IV of the Amended Complaint and referred the motion for default judgment (ECF No. 28) to the undersigned for a calculation of damages on Counts I through IV only. *See* ECF No. 32. For the reasons set for below, this Court recommends

---

[1] The Amended Complaint defines Ayurveda as "a holistic medical approach that originated on the Indian subcontinent." Am. Compl. ¶ 2, ECF No. 7.

[2] Plaintiff initially named ten individual Baidyanath directors and shareholders as defendants (*see* Compl.), but Weiss later dismissed all claims against the individual defendants. Not. of Voluntary Dismiss., ECF No. 20.

awarding plaintiff a total of $2.6 million in damages, consisting of $1.3 million in compensatory damages and $1.3 million in punitive damages. This Court does not recommend awarding damages for future pain and suffering.

## BACKGROUND[3]

In January 2019, plaintiff, a resident of New Jersey, traveled to India with his wife to visit his wife's family. Am. Compl. ¶¶ 19, 37. Plaintiff and his wife "had been trying to start a family for quite some time" and visited an Ayurvedic practitioner for a fertility consultation during their trip. *Id.* ¶ 37. The Ayurvedic practitioner recommended plaintiff begin taking several Ayurvedic supplements manufactured by defendant: *Pushpadhanwa Ras*, *Shukramatrika Bati* and *Manmath Ras* (the "Supplements"). *Id.* ¶ 38. Plaintiff purchased the Supplements while in India after having reviewed Baidyanath's U.S. website, which stated that the Supplements had "no side effects" and offered a "gentle healing touch." *Id.* ¶¶ 38–39. Plaintiff returned to the United States on January 20, 2019, and began taking the recommended daily dose of the Supplements (two capsules of each supplement) the following day. *Id.* ¶ 40. Within a few weeks, plaintiff "began to notice intermittent tenderness in his abdomen." *Id.* ¶ 41. Plaintiff's symptoms intensified, and he began experiencing abdominal bloating, fatigue, lethargy, and shortness of breath. *Id.* ¶¶ 42–43. Plaintiff stopped taking the Supplements as a precaution; however, his condition continued to deteriorate. *Id.* ¶¶ 44–45.

After several hospital visits to New York-Presbyterian Weill Cornell Medical Center ("New York-Presbyterian"), plaintiff's blood tests revealed that he "had been poisoned with a lethal dose of lead." *Id.* ¶ 49. At one point, his blood contained lead levels that were eight to ten

---

[3] The following facts taken from the Amended Complaint (ECF No. 7) are assumed to be true for the purpose of this report and recommendation.

times greater than the levels considered "high" by the Centers for Disease Control and Prevention ("CDC"). *Id.* ¶¶ 4, 49, 52. Plaintiff's "[lead] poisoning was so severe that his doctors had never seen a patient present with [his] symptoms." *Id.* ¶ 50. Plaintiff continues to experience symptoms of lead poisoning following treatment in early 2019, including headaches and fatigue, and "doctors are unsure whether [plaintiff's] body will ever fully purge itself of the [toxins]" contained in the Supplements. *Id.* ¶ 58.

Staff at New York-Presbyterian provided samples of the Supplements to the New York City Department of Health and Mental Hygiene for testing. *Id.* ¶ 59; *id.* Ex. A. The tests revealed that the Supplements contained significantly high and unsafe levels of lead, mercury, and arsenic. Am. Compl. ¶ 59, 60; *id.* Ex. A; *see* Mem. and Order dated Apr. 10, 2024, ECF No. 32, at 3.

Plaintiff also alleges that prior tests conducted by the U.S. Food and Drug Administration ("FDA") in 2015 had similarly found that defendant's Ayurvedic supplements contained "high levels of mercury and lead." Am. Compl. ¶ 34. In 2016, the Canadian government also issued an "alert" noting the "high levels of mercury and lead" in defendant's supplements. *Id*.

On January 12, 2021, plaintiff filed his initial Complaint, *see* ECF No. 1, and on March 22, 2021, filed his Amended Complaint, *see* ECF No. 7. In his Amended Complaint, plaintiff alleges claims for strict products liability (Count I), negligent products liability (Count II), strict liability for failure to warn (Count III), negligent failure to warn (Count IV), battery (Count V), and intentional infliction of emotional distress (Count VI). *See generally* Am. Compl.

Upon plaintiff's application and in light of defendant's failure to appear or otherwise defend this action, the Clerk of the Court entered default against defendant on September 7, 2022. *See* Clerk's Entry of Default, ECF No. 27. On October 7, 2022, plaintiff moved for

3

default judgment against defendant.  Mot. for Default J., ECF No. 28.  On April 10, 2024, Judge Korman granted in part plaintiff's motion for default judgment.  *See* ECF No. 32.  Judge Korman found that plaintiff had alleged facts sufficient to establish liability on his products liability claims (Counts I through IV), but not as to his intentional tort claims (Counts V and VI), which were barred by the applicable statute of limitations.  *Id.*  Judge Korman referred the motion for default judgment to the undersigned for an assessment of damages on Counts I through IV.  *Id.*

## DISCUSSION

Although the Court has found that plaintiff's allegations are sufficient to establish liability on his products liability claims (Counts I through IV), *see* ECF No. 32, defendant's default "is not considered an admission of damages."  *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)).  Rather, "the court must conduct an inquiry sufficient to establish damages to a 'reasonable certainty.'"  *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012) (quoting *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).  A court may make this determination based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence.  *See* Fed. R. Civ. P. 55(b)(2); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991).

I.   *Legal Standards*

"The assessment of damages following entry of a default judgment in a diversity action is governed by state law standards."  *Hinckley v. Westchester Rubbish, Inc.,* No. 04-CV-189, 2006 WL 2849841, at *4 (S.D.N.Y. Oct. 2, 2006) (citing *Consorti v. Armstrong World Indus., Inc.,* 103 F.3d 2, 4 (2d Cir. 1995)); *see also Godfrey v. Soto*, No. 06-CV-428, 2007 WL 2693652, at *4 (E.D.N.Y. Sept. 10, 2007) ("In a case over which a federal court exercises diversity

4

jurisdiction, state law governs the court's inquiry into damages." (citing *Consorti*, 103 F.3d at 4)).

"Under New York law . . . courts look to approved awards in similar cases as guideposts in fashioning appropriate damage awards." *Hinckley*, 2006 WL 2849841, at *4; *see also Castro v. U.S. Postal Serv.*, No. 11-CV-5071, 2015 WL 1412660, at *3 (E.D.N.Y. Mar. 23, 2015) ("When determining pain and suffering awards, courts often look to awards in similar cases."). "This is done to ensure that an award of damages does not [deviate] materially from what would be reasonable compensation." *Glassman-Brown v. Pouring Wine, LLC*, No. 14-CV-3763, 2015 WL 5853802, at *2 (S.D.N.Y. Aug. 5, 2015) (alteration in original) (internal quotation marks and citation omitted), *report and recommendation adopted in part*, 2015 WL 5853807 (S.D.N.Y. Oct. 7, 2015).

II.   *Analysis*

Here, plaintiff seeks compensatory damages in the total amount of $1.55 million, consisting of $1.3 million for past mental and physical pain and suffering, and $250,000 for future mental and physical pain and suffering. *See* Mem. of Law in Support of Pl.'s Mot. for Default J. ("Pl.'s Mem") at 24, ECF No. 28-1. Plaintiff also seeks an award of punitive damages in the amount of $1.55 million. *Id.* at 25.

A.   *Compensatory Damages*

Generally, under New York law, a plaintiff may recover damages for "loss of earnings, medical expenses, and [for] mental and physical pain and suffering." *Glassman-Brown*, 2015 WL 5853802, at *2 (alteration in original) (quoting *Norcia v. Dieber's Castle Tavern, Ltd.*, 980 F. Supp. 2d 492, 501 (S.D.N.Y. 2013)). New York courts have acknowledged that, unlike medical expenses, compensation for pain and suffering "does not lend itself to neat mathematical

5

calculation." *Caprara v. Chrysler Corp.*, 417 N.E.2d 545, 551 (N.Y. 1981); *see also Reed v. City of New York*, 757 N.Y.S.2d 244, 248 (1st Dep't 2003) ("[P]ersonal injury awards, especially those for pain and suffering, are subjective opinions which are formulated without the availability, or guidance, of precise mathematical quantification."). While "[f]uture pain and suffering damages are calculated in part through reference to actuarial tables to determine the projected life span of the plaintiff," past pain and suffering damages do not depend on actuarial tables. *House v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x 206, 209 (2d Cir. 2010). "New York courts have awarded past pain and suffering damages based on the medical procedures endured and nature of the injury suffered." *Id.* at 209–10. "[A]s to both future- and past-pain-and-suffering damages, 'comparable approved awards from similar cases serve as guideposts for determining reasonable compensation under New York law . . . .'" *Norcia*, 980 F. Supp. 2d at 505 (alteration in original) (quoting *Gottesman v. Ashdod*, No. 00-CV-5139, 2003 WL 21383819, at *2 (S.D.N.Y. June 11, 2003)).

Here, plaintiff has provided declarations from himself, his wife, and two treating physicians at New York-Presbyterian in support of his request for damages for past mental and physical pain and suffering. *See* Pl.'s Mem. at 23; Decl. of Thilo Weiss ("Weiss Decl."), ECF No. 28-5; Decl. of Rashmi Nautiyal Weiss ("Nautiyal Decl."), ECF No. 28-4; Decl. of Ezra Gabbay M.D. ("Gabbay Decl."), ECF No. 28-2; Decl. of Rama B. Rao, M.D. ("Rao Decl."), ECF No. 28-3. The declarations describe the severity of plaintiff's lead poisoning and the symptoms and treatment he endured.

For example, Dr. Rama B. Rao, a physician specializing in toxicology at New York-Presbyterian, who treated plaintiff for lead poisoning, stated that "[plaintiff's] case was one of the most severe instances of lead poisoning" that she had seen in her career with "severe

6

neurological, hematological, and gastrointestinal toxicity." Rao Decl. ¶¶ 2, 3.

Dr. Ezra Gabbay, an associate professor of Clinical Medicine at Weill Cornell Medicine, who also treated plaintiff for lead poisoning, similarly stated that he "d[id] not recall ever seeing someone with such a high blood lead level." Gabbay Decl. ¶ 11. Plaintiff's wife, Rashmi Nautiyal Weiss, recalls watching her husband's physical and mental condition "decline . . . steeply" and said that at one point "[h]e couldn't sit, stand or lie down without feeling excruciating pain . . . ." Nautiyal Decl. ¶¶ 10–11, 13. On one occasion, after being admitted to New York-Presbyterian, plaintiff spent the night "scream[ing] and writh[ing] in agony." Nautiyal Decl. ¶ 14; *see also* Weiss Decl. ¶ 14. After plaintiff's test results came back in April 2019, plaintiff underwent a series of "extremely uncomfortable" and "excruciatingly painful" treatments that caused "a variety of distressing side effects that left [plaintiff] utterly incapacitated . . . ." Weiss Decl. ¶¶ 19–22.

Plaintiff allegedly continues to "suffer from frequent and recurring bouts of anxiety because [he] do[es] not know how the poison from the . . . Supplements will impact [his] mind and body as [he] age[s]," and he "still experience[s] some acute symptoms of lead poisoning, including headaches and fatigue." *Id.* ¶¶ 26, 28.

The declarations plaintiff provided in support of his motion for a default judgment establish that he endured severe pain and suffering from ingesting the Supplements containing high concentrations of heavy metals. This Court, therefore, finds that plaintiff's documented symptoms support an award for compensatory damages for past pain and suffering.

The Court now turns to the issue of quantifying the appropriate amount of damages for plaintiff's past pain and suffering. Plaintiff directs the Court to two New York cases, which plaintiff contends support the requested compensatory damages award. *See* Pl.'s Mem. at 21–22.

7

First, in *Wilson*, three plaintiffs suffered from lead poisoning after inhaling fumes while performing demolition work. *See Wilson v. City of New York*, 65 A.D.3d 906, 907 (1st Dep't 2009). In *Wilson*, "each of the plaintiffs had substantially similar symptoms, including memory loss, headaches, fatigue, loss of appetite, aching joints and muscles, depression, loss of libido and night sweats." *Id.* at 910. On appeal, the First Department on September 15, 2009, found that the damages awarded by the jury for past and future pain and suffering were "excessive," and ordered a new trial on the issue of damages unless the three plaintiffs would stipulate to damages of $900,000[4] each (approximately $1,323,819.16, accounting for inflation) for past pain and suffering. *Id.* at 907, 909. The stipulated damages award for each plaintiff for past pain and suffering in *Wilson* amounts to approximately $1.3 million when accounting for inflation, which is nearly identical to the amount of past pain and suffering plaintiff seeks here.

Second, in *Solomon*, a case involving construction workers who allegedly inhaled lead fumes while performing demolition work, the Second Department on May 28, 1985 found that a damages award of $360,000 (approximately $1,065,811.37, accounting for inflation) to one of the plaintiffs, Doyle W. Manley, was appropriate in light of "(1) the evidence with regard to the permanency of his injury, (2) his current suffering of symptoms as the result of lead poisoning caused by the inhalation of lead fumes . . . , and (3) his inability to work for approximately six

---

[4] The awards in comparable cases must be adjusted for inflation when considered by the court. *See, e.g.*, *Jennings v. Yurkiw*, 18 F.4th 383, 393 & n.7 (2d Cir. 2021); *Theodat v. City of New York*, No. 16-CV-3977, 2019 WL 4385794, at *6 & n.5 (E.D.N.Y. Sept. 13, 2019), *aff'd*, 818 F. App'x 79 (2d Cir. 2020). Here, this Court uses the Bureau of Labor Statistics' Inflation Calculator to adjust for inflation from the time the award was rendered until January 2025, the latest month for which such data is available. *See* CPI Inflation Calculator, U.S. Bureau Of Lab. Stat., bls.gov/data/inflation_calculator.htm (last visited Mar. 7, 2025). *See Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 97 & n.11 (applying Bureau of Labor Statistics' Consumer Price Index ("CPI") to adjust damages awards for inflation). According to the Bureau of Labor Statistic's inflation calculator, $900,000 in September 2009 has the same buying power as $1,323,819.16 in January 2025. *See* CPI Inflation Calculator.

8

years, resulting in a loss of earnings of approximately $235,000." *Solomon v. City of New York*, 111 A.D.2d 383, 384, 386–87 (2d Dep't 1985), *aff'd*, 70 N.Y.2d 675 (N.Y. 1987).  However, the appellate court in *Solomon* also affirmed the finding that the damages awarded to two of the plaintiffs (*i.e.*, Dominick Durante ("Durante") and Ralph Mancuso ("Mancuso")), in the amounts of $305,000 and $295,000 were excessive given that "with respect to these plaintiffs . . . there was no testimony as to (1) the permanency of their injuries, (2) the continuation of any acute symptoms as a result of lead poisoning caused by the inhalation of lead fumes . . . , or (3) their total unemployment for a substantial period of time as a result of their injuries." *Id.* at 387.[5]

Plaintiff argues that "[his] symptoms were . . . plainly more severe and long-lasting than the symptoms suffered by the plaintiffs in *Solomon*" and that, unlike plaintiffs Durante and Mancuso in *Solomon*, plaintiff "continues to suffer from acute physical symptoms of lead poisoning, including headaches and fatigue, in addition to the mental stress and anxiety caused by the uncertainty of how the lead poisoning will affect him in the future." Pl.'s Mem. at 24. Although plaintiff has not proffered evidence as to lost earnings or the permanency of his injuries, the Court finds plaintiff's past pain and suffering justify a compensatory damages award that is on the higher end of what New York courts have awarded in other lead poisoning cases.[6]

---

[5] The trial court instead reduced Mancuso's award to $175,000 and Durante's award $200,000 (approximately $518,102.75 and $592,117.43, accounting for inflation, respectively). *Id.* at 384.

[6] This Court notes that in cases involving lead poisoning caused by lead paint, New York courts have upheld past pain and suffering awards ranging from about $100,000 to $500,000 (approximately $175,605.86 to $897,882.98, when accounting for inflation). *See, e.g.*, *Guerrero v. Djuko Realty, Inc.*, 752 N.Y.S.2d 694, 695 (2d Dep't 2002) (reducing damages award for past pain and suffering from $250,000 to $100,000, or approximately $175,605.86 accounting for inflation (decision issued on Dec. 23, 2002)); *La Fountaine ex rel. Currie v. Franzese*, 724 N.Y.S.2d 514, 517–18 (3d Dep't 2001) (upholding jury verdict of $500,000 for past paid and suffering, or approximately $897,882.98 accounting for inflation (decision issued on Apr. 26, 2001)).  In *La Fountaine* the Third Department upheld a jury verdict for $500,000 for past pain

9

Here, based on plaintiff's blood test results, plaintiff had 78 micrograms per deciliter of lead on one occasion and the elevated levels of lead in his bloodstream caused him severe and sometimes excruciating pain. Am. Compl. ¶ 49; *see id.* ¶¶ 45–46. In light of the significant symptoms plaintiff experienced, as well as the damages awards in other cases involving lead exposure, this Court finds that a damages award of $1.3 million for past mental and physical pain and suffering is reasonable and recommends awarding plaintiff **$1.3 million** for past pain and suffering.

However, the Court finds that plaintiff has not sufficiently established damages for future pain and suffering.[7] Specifically, although plaintiff states that "doctors have told [him] that they do not know how the . . . Supplements will affect [his] body and health in the future and have advised [him] to keep monitoring [his] blood lead levels indefinitely," Weiss Decl. ¶ 29, neither of plaintiff's treating physicians provided any indication that his symptoms will continue or that he will experience permanent physical impairment as a result of his acute lead poisoning. *See La Fountaine*, 724 N.Y.S.2d at 517–19 (upholding jury verdict for future pain and suffering where evidence established that plaintiff suffered "permanent disorders" as a result of lead poisoning); *Solis-Vicuna v. Notias*, 71 A.D.3d 868, 870 (2d Dep't 2010) (upholding verdicts for future pain

---

and suffering (approximately $897,882.98 when accounting for inflation), in a case involving a child plaintiff who suffered lead poisoning resulting from the "ingestion, inhalation and absorption of lead-based paint chips" over an approximately 1.5-year period. *See La Fountaine*, 724 N.Y.S.2d at 515–16. Notably, the plaintiff in *La Fountaine* experienced much lower concentrations of lead in her bloodstream as compared to what plaintiff in this case experienced. There, plaintiff's elevated lead levels—which were discovered during a routine pediatric examination—ranged from between 11 micrograms to 24 micrograms per deciliter. *See id.* at 515–16; *but see Jackson v. Chetram*, 751 N.Y.S.2d 551, 552 (2d Dep't 2002) (setting aside a jury award for $500,000 for past pain and suffering in a lead paint case because the award "deviated materially from what would be reasonable compensation").

[7] Plaintiff requests $250,000 for future mental and physical pain and suffering. *See* Pl.'s Mem. at 24.

and suffering where "medical experts testified that the infant plaintiffs suffered brain damage as a result of their exposure to lead dust, were only beginning to exhibit the [sequelae] of lead poisoning, and that their conditions would worsen over time"). Instead, plaintiff admits that his doctors "do not know" how the Supplements will continue to affect his body. Weiss Decl. ¶ 29. Plaintiff's wife attests that plaintiff's doctors have told him that "there is no way to tell what type of effect the lead poisoning will have on his health in the future, and that the lead poisoning *could* have long-term effects on his brain health." Nautiyal Decl. ¶ 22 (emphasis added).

However, the declarations provided by plaintiff's treating physicians include no reference to possible long-term symptoms. *See* Gabbay Decl., ECF No. 28-2; Rao Decl., ECF No. 28-3. Thus, this Court finds that plaintiff's requested award for future mental and physical pain and suffering, in the amount of $250,000, is speculative, and recommends denying plaintiff's request for damages for future pain and suffering.

This Court, therefore, recommends awarding plaintiff **$1.3 million** in compensatory damages for past mental and physical pain and suffering only.

        B.    *Punitive Damages*

Plaintiff seeks an award of $1.55 million in punitive damages. *See* Pl.'s Mem. at 25 (requesting punitive damages in equal amount to the requested compensatory damages). New York law permits a plaintiff to recover punitive damages where the conduct "may be characterized as gross and morally reprehensible, and of such wanton dishonesty as to imply a criminal indifference to civil obligations." *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 315–16 (N.Y. 1995) (internal quotation marks and citation omitted); *see also Home Ins. Co. v. Am. Home Prods. Corp.*, 75 N.Y.2d 196, 203 (N.Y. 1990) ("The nature of the conduct which justifies an award of punitive damages has been variously described, but, essentially, it is

11

conduct having a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." (internal quotation marks and citations omitted)). "The alleged conduct 'need not be intentionally harmful but may consist of actions which constitute willful or wanton negligence or recklessness.'" *Munoz v. Emerson Tool Co.*, No. 03-CV-2885, 2007 WL 9706982, at *13 (E.D.N.Y. Aug. 13, 2007) (Korman, J.) (quoting *Home Ins. Co.*, 75 N.Y.2d at 204). "An award of punitive damages serves the dual purpose of punishing the offending party and deterring similar conduct on the part of others." *Solis-Vicuna*, 71 A.D.3d at 871. Although an award of punitive damages is generally "a question within the sound discretion of the jury," *id.*, "[p]unitive damages may be awarded as part of a default judgment," *Bo Zhang v. N. Cnty. Beautification Co.*, No. 12-CV-721, 2016 U.S. Dist. LEXIS 60591, at *16 (W.D.N.Y. May 5, 2016), *report and recommendation adopted*, Order dated June 2, 2016.

When determining the appropriate amount of punitive damages, courts in this Circuit have upheld punitive damages awards that matched the award for compensatory damages. *See, e.g.*, *Navika Capital Grp., LLC v. Doe*, No. 14-CV-5968, 2017 U.S. Dist. LEXIS 2926, at *49 (E.D.N.Y. Jan. 6, 2017) (finding that a "one-to-one ratio of punitive damages to compensatory damages" was reasonable), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 40820 (E.D.N.Y. Mar. 20, 2017); *Bo Zhang*, 2016 U.S. Dist. LEXIS 60591, at *17 (awarding punitive damages in an amount equal to the compensatory damages award). Punitive damages awards must also satisfy due process, which requires that awards of punitive damages be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 344 (S.D.N.Y. 2016) (quoting *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 75 (E.D.N.Y. 2002), *aff'd*, 93 F. App'x 260

(2d Cir. 2004)). Although the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," the Court has stated that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424–25 (2003).

Here, plaintiff's allegations, which this Court accepts as true for purposes of assessing damages in this default proceeding, establish that defendant acted with wanton negligence or recklessness with regards to its civic duties by failing to warn plaintiff that its products contained unsafe levels of toxic compounds such as lead, mercury, and arsenic. Defendant marketed the Supplements as safe and free of side effects despite the fact that at least two government authorities had warned that defendant's products contained unsafe levels of heavy metals. *See* Am. Compl. ¶¶ 34–35, 39; Pl.'s Mem. at 25. In other words, defendant "knew about, but failed to warn users of, extremely serious health risks associated with use of" its Supplements. *Lotrean v. 3M Co.*, No. 153361/2020, 2021 WL 1331347, at *3 (N.Y. Sup. Ct. Apr. 8, 2021)*; see* Pl.'s Mem. at 25.

For the reasons set forth above, and to deter defendant and other supplement manufacturers from marketing toxic and potentially lethal products to consumers, this Court recommends awarding plaintiff punitive damages in an amount equal to the award for compensatory damages, namely **$1.3 million**.

## CONCLUSION

For the reasons stated above, this Court respectfully recommends awarding plaintiff **$1.3 million** in compensatory damages for past mental and physical pain and suffering and awarding plaintiff **$1.3 million** in punitive damages, for a total of **$2.6 million** in damages, but denying the

13

request for damages for future pain and suffering.

Any objections to the recommendations made in this Report must be filed with the Honorable Edward R. Korman within 14 days after the filing of this Report and Recommendation and, in any event, on or before **March 21, 2025**. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam) (discussing waiver under the former ten-day limit).

A copy of this Report and Recommendation is being electronically served on counsel. This Court directs plaintiff to serve a copy of this Report and Recommendation on defendant, by any means available, and to file proof of service on ECF by **March 12, 2025**.

**SO ORDERED.**

Brooklyn, New York
March 7, 2025

s/ James R. Cho
James R. Cho
United States Magistrate Judge